**In re CROWN OIL, INC., Debtor.**

**No. 97–12016–7.**

United States Bankruptcy Court,
D. Montana.

Sept. 13, 2000.

1999; December 16, 1999; January 20 and 26, 2000; and February 1 and 15, 2000.

Gary S. Deschenes, Great Falls, MT, for debtor.

Joel E. Guthals, Wright, Tolliver, Guthals, P.C., Billings, MT, for applicants.

## *ORDER*

RALPH B. KIRSCHER, Bankruptcy Judge.

Two applications for professional fees filed by Gary S. Deschenes ("Deschenes"), attorney for the Debtor, and Tim J. Watts ("Watts"), economist for the Debtor are pending in this Chapter 7, which was converted from Chapter 11 by Order entered by the Court on September 9, 1998[1]. Both Deschenes and Watts seek compensation from the estate pursuant to 11 U.S.C. § 330(a) for services rendered while this case was in Chapter 11. Deschenes filed his application on April 21, 2000, requesting an award of fees in the sum of $46,104.00 and costs in the sum of $7,549.28. Watts also filed his application on April 21, 2000, requesting $20,316.13 in fees and $308.00 in costs. Because both fee applications request awards of professional fees from a Chapter 7 estate after conversion of the case from Chapter 11, this Order addresses both applications.

---

1. Hereinafter referred to as the "Conversion Order". No relief has been requested and no notice of appeal from the Conversion Order has been filed, and thus the Court's findings and conclusions set forth in the Conversion Order are final, undisputed, and deemed established for purposes of this Order.

After due notice, a hearing on both applications was held at Billings on June 19, 2000. Deschenes and Watts each appeared and testified. No appearance was made at the hearing in opposition. Exhibits 1 through 14 were admitted into evidence. The Chapter 7 Trustee Joseph V. Womack ("Womack") appeared and stated he had no objection to either fee application. Womack reported that approximately $125,000 remain in the Chapter 7 estate, and that after payment of first tier administrative expenses which he estimated will total $50,000, about $75,000 will remain available for second tier administrative expenses, with the balance of any estate funds being available for distribution to creditors[2]. At the close of the hearing the Court took the fee applications under advisement. After reviewing both fee applications, the record, and applicable law, these two fee applications are ready for decision.

At issue is whether Deschenes and Watts should be awarded professional fees and costs under 11 U.S.C. § 330(a) for their services while this case was in Chapter 11, when the Chapter 11 reorganization was unsuccessful and the case was converted to Chapter 7.

## BACKGROUND FACTS

The Debtor is an oil producing company which leased oil production wells at a royalty price, and then sold the oil from the producing wells. Debtor filed its Chapter 11 petition on August 1, 1997, to prevent the cancellation of its interests in oil wells

by default. Deschenes' memorandum filed April 21, 2000, states that as of the filing date "Debtors['] operation was in a shambles, to say the least." Furthermore, "the books and records of the company were atrocious."[3] The shareholders were arguing among themselves over their percentage ownership and other issues, which hampered Deschenes' and Watts' abilities to analyze the Debtor's operations and its prospects given the lack of cooperation by the shareholders.

Prior to filing in 1997, Debtor had entered into an agreement with Resource-Fund, L.P.I. ("ResourceFund") whereby it paid the Debtor $3,500,000 to acquire an ownership interest in the wells and provide the Debtor with a capital infusion to perform horizontal drilling. That obligation was secured by other assets of the Debtors. Conversion Order, p. 4. Notwithstanding that infusion, upon the filing of Debtor's Chapter 11 case the Debtor was without funds to operate the existing oil properties. *Id.* The oil wells were in poor condition from years of neglect due to Debtor's lack of financial resources. *Id.*

Watts and Deschenes testified that Debtor's primary assets constituted Debtor's disputable oil leases, and potential preference actions against shareholders. ResourceFund contended that the Debtor had no interest in the wells given its default under the prepetition agreement. After the Chapter 11 petition was filed, Deschenes entered into negotiations with ResourceFund in October of 1997. Watts testified that Deschenes negotiated a ten

---

2. By Order entered April 25, 2000, this Court awarded counsel for the Official Creditors Committee Phil F. Snow the sum of $12,202.64, and awarded Charles W. Hingle the sum of $10,783.39, both allowed as second tier priority expenses. Deschenes' total request for fees and costs is $53,653.28. Watts' total request is $20,624.13. If Deschenes' and Watts' requests for compensation were granted in full, the total second tier administrative expenses would consume the entire estimated $75,000 in available estate funds.

3. Watts' memorandum describes the Debtor's records and bookkeeping system as "inaccurate" to the point they "provided no information from which to be of any use in preparing the schedules." The shareholders were arguing over their percentage ownership. Watts' billing entry for 9/11/97 states that shareholders who had financial information would not even meet. As late as 3/6/98, the Carvers threatened to make the Debtor's computer system which held Debtor's information disappear. Watts' billing statement for 3/06/98, p. 5. Watts testified the Debtor's computer was eventually erased.

percent (10%) interest in the oil wells, which Debtor sold back to Rimco, an operating entity provided through Resource-Fund, generating the single major asset[4] of the estate.

The Debtor entered into a Joint Management Agreement ("JMA") whereby ResourceFund would advance cash collateral of up to $350,000.00 and provide an operating entity (Rimco) to operate the wells. The Court approved the JMA by Order entered December 12, 1997, and allowed all advances by ResourceFund as a priority administrative expense. Debtor was granted until January 15, 1998, to file a Chapter 11 Plan of Reorganization and a Disclosure Statement. The Debtor filed its Plan and Disclosure Statement on January 20, 1998, together with a certificate of mailing. An Amended Disclosure Statement and exhibits were filed on March 17, 1998. This Amended Disclosure Statement included copies of the same exhibits that were attached with the original Disclosure Statement even though oil prices upon which the projections were based had at the time been falling for 4 months. Such price in November 1997 was $16.83 per barrel and was $12.17 per barrel in February 1998. Ex. 11, p. 2.

When Rimco took over operation of Debtor's oil wells, the majority of the wells were in poor condition and required unexpected expenses. Conversion Order, p. 4–5. One of the major producing wells developed a casing problem; no money existed to fix it. Rimco's expenses substantially exceeded production. By the date of the Conversion Order only 18 of 36 oil wells were operating, and production dropped after an initial start-up surge when Rimco took over. *Id.* In addition to Debtor's other troubles, the price of oil dropped to $10 per barrel and stayed below what Watts calculated was required for confirmation.

Watts testified that Debtor and its professionals knew in February or March 1998 that reorganization could not be successful with the low price of oil. Watts testified that an oil price of at least $15.23 per barrel was necessary to generate sufficient income to fund the Plan. The exhibits to the Disclosure Statement filed Jan 20, 1998, and the Amended Disclosure Statement filed March 17, 1998, use a per barrel price of $16.00. Deschenes testified that he knew in January 1998 that the plan of reorganization could not be confirmed with such low oil prices. In fact, the per barrel oil price fell below $15.23 in December 1997 and remained below that price for eighteen (18) months. Ex. 11, p. 2. As a consequence, Deschenes testified that he did not mail the Plan to all creditors; the high costs of copying and mailing associated with sending the Plan to so many creditors were not warranted when he knew it could not be confirmed. Deschenes' testimony directly contradicts his certificate of mailing which was filed together with the Plan and Disclosure Statement on January 20, 1998, in which Lisa Peck of Deschenes' office certifies "under penalty of perjury" that the Plan and Disclosure Statement were mailed by first class mail to all parties on January 15, 1998[5]. After approval of the Amended Disclosure Statement in April 1998 and after the Court entered its Order on May 21, 1998, ordering Debtor to show cause why the case should not be dismissed for the Debtor's failure to file proof of service of the Plan, Disclosure Statement, and ballot on creditors, Deschenes filed a response admitting that the Plan was not mailed to creditors as earlier certified because "Debtor believed it was a waste of the estate assets to spend over $1,000.00 to mail out a plan that the Debtor knew was not feasible." Debtor's Response, filed May 26, 1998, p. 3. Des-

---

4. After conversion of this case to Chapter 7, Watts advised the Chapter 7 Trustee of the potential preference actions against the shareholders.

5. Deschenes' billing statement verifies his testimony that the Plan and Disclosure Statement were not mailed to all creditors, notwithstanding the certificate of mailing.

chenes argued that the Debtor should be able to file a liquidating plan.

During the administration of the chapter 11 case, numerous problems befell the Debtor and its professionals: Watts and Deschenes knew the tax returns were wrong or inaccurate; both pre-and post-petition federal unemployment and employer's quarterly tax returns were delinquent; and the Plan failed to address Bureau of Land Management ("BLM") problems with the oil wells. After a hearing on the Disclosure Statement at which Deschenes admitted the objections to the Disclosure Statement were well taken, the Debtor was ordered to file an amended Disclosure Statement by Order entered March 3, 1998, and a hearing on approval was set for April 10, 1998. After this hearing, Debtor's Amended Disclosure Statement was approved. Debtor was to serve copies of the Plan, Disclosure Statement, notice and ballots to creditors prior to May 18, 1998, and the confirmation hearing was set for June 10, 1998.

The Court held a Show Cause hearing on May 27, 1998, at which Deschenes admitted that the price of oil made reorganization impossible. The Court entered an Order giving the Debtor until June 29, 1998, to file a liquidating Plan. By this time, Debtor's president Mark Kucera ("Kucera") was giving Deschenes conflicting instructions. Ex. 6, 7. Both Deschenes and Watts knew that reorganization was impossible due to the drop in the oil price alone.[6] Kucera, on behalf of Debtor, agreed to submit a liquidating Plan, but later backed away and demanded to submit a reorganization Plan which would cancel the post-petition agreement with ResourceFund and cram down Rimco. Ex. 6, 7. Deschenes had problems communicating with Kucera. *Id.* Eventually, Debtor filed a liquidating Plan on June 26, 1998. After a confirmation hearing on Au-

gust 12, 1998, the Court entered the Conversion Order on September 9, 1998.

The Conversion Order identifies a litany of deficiencies with the liquidating Plan. Debtor had still not filed corrected tax returns, thereby "leaving the IRS in limbo under the Plan." Conversion Order, p. 5. The question of whether BLM leases or other leases were assumed or rejected was ignored; § 1129(a)(7) was violated; and no detail existed on how the sale of Debtor's assets would be conducted. *Id.*, pp. 2–4. The oil wells were still in poor condition with no money available for repair; operating losses continued. The Debtor wanted to displace Rimco as operator, without cash resources. It hoped and prayed that oil prices would rise in the course of one year even though Debtor's financial records showed "the Debtor [was] losing money at an alarming rate, on property that [was] admittedly in a dismal state of repair." Conversion Order, p. 8. The liquidating Plan shifted the financial risk to the creditors, and avoided discussion on how any obligation would be successfully repaid. Debtor's evidence was "deplorably weak and even non-existent", contributing to a "maze of conjecture" and speculation. Conversion Order, pp. 5, 7. With the above background, the Court turns to the applicable standard for Watts' and Deschenes' applications for professional fees.

## DISCUSSION

### I. § 330(a)—Generally

■ Despite the magnitude of Deschenes' and Watts' applications for compensation, and the obvious issues related to the reasonableness of such fee requests in light of the conversion of this case from Chapter 11 to Chapter 7, the U.S. Trustee has not filed a response to either application pursuant to 28 U.S.C. § 586(a)(3)(A). Notwithstanding the absence of opposition to this fee application, this Court has an

---

**6.** They collectively knew reorganization was impossible given the oil price from at least January 1998, possibly since December 1997,

when the oil price dropped to $15.04 per barrel, an amount below that required by Debtor's projections to fund a plan.

independent obligation to review each application to evaluate the propriety of the compensation requested. *In re Busy Beaver Bldg. Centers, Inc.,* 19 F.3d 833, 841 (3rd Cir.1994); *In re Wildman,* 72 B.R. 700, 701 (Bankr.N.D.Ill.1987). This obligation is especially important in the instant case, given a recently published decision by this Court which stated: "The record in this case tends to indicate that the services performed by Deschenes and Watts did not benefit Debtor or the estate. *See Keate v. Miller (In re Kohl),* 95 F.3d 713, 714 (8th Cir.1996)." *In re Crown Oil, Inc.,* 18 Mont. B.R. 270, 283 (Bankr.Mont. 2000).

In *Busy Beaver,* the court explained:

[T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte.* The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.... Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties.

*Busy Beaver,* 19 F.3d at 841 (*quoting In re Evans,* 153 B.R. 960, 968 (Bankr.E.D.Pa. 1993)).

■ Extensive case law has developed regarding the amount and type of information that applicants must include in their fee applications. The case of *In re WRB–West Associates,* 9 Mont. B.R. 17, 18–20 (Bankr.D.Mont.1990) summarizes:

Pursuant to 11 U.S.C. §§ 327–330 and Bankruptcy Rules 2016 and 2017, this Court has an independent judicial responsibility to evaluate fees requested from the estate. *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 831 (Bankr.Vt.

1987); *In re Seneca Oil Co.,* 65 B.R. 902 (Bankr.W.D.Okla.1986); *In re Frontier Airlines, Inc.,* 74 B.R. 973 (Bankr.Colo. 1987). The burden of proof to show entitlement to all fees requested from the estate is on the applicant. *In re Lindberg Products, Inc.,* 50 B.R. 220, 221 (Bankr.N.D.Ill.1985). This burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate. *In re Yankton College,* 101 B.R. 151, 158 (Bankr.S.D.1989); *In re Pettibone Corp.,* 74 B.R. 293, 305 (Bankr.N.D.Ill.1987). All expenses and fees must be shown as both actual and necessary under § [330(a)(3)] of the Code. *S.T.N.,* 70 B.R. at 834; *Yankton College,* 101 B.R. at 158; *Seneca Oil,* 65 B.R. at 912. Moreover, *In re Convent Guardian Corp.,* 103 B.R. 937, 939–40 (Bankr. N.D.Ill.1989) holds:

Bankruptcy Rule 2016 provides that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (emphasis added) The Application should contain a detailed list of expenses including the date, the type and the amount. Expenses must be actual not estimates. *In re Wildman,* 72 B.R. 700, 731 (Bankr.N.D.Ill. 1987); *In re Marsh,* 14 B.R. 615, 617 (Bankr.E.D.Va.1981). An expense is necessary if it is incurred because it was reasonably needed to accomplish the proper representation of the client. *Wildman,* 72 B.R. at 731.

■ The above excerpt demonstrates that this Court is obligated to review each request for fees and costs to determine whether the applicant provides:

1. A description of the services provided, setting forth, at a minimum, the parties involved and the nature and purpose of each task;
2. The date each service was provided;
3. The amount of time spent performing each task; and
4. The amount of fees requested for performing each task.

Attached to both Deschenes' and Watts' fee applications are billing statements setting forth the services each Applicant provided, the dates the services were provided, and the amount of time spent on the services.

Deschenes' fee application contains summaries for project categories worked in this case at paragraph 6, setting forth the following project categories, hours, and amounts:

| | | |
|---|---|---|
| Asset Disposition | 68.00 hrs. – | $ 8,160.00 |
| Case Administration | 65.60 hrs. – | $ 7,872.00 |
| Claims Adm. And Objection | 112.50 hrs. – | $13,536.00 |
| Fee/Employment Applications | 5.10 hrs. – | $ 612.00 |
| Financing | 15.70 hrs. – | $ 1,884.00 |
| Plan and Disclosure Statement | 82.80 hrs. – | $ 9,936.00 |
| Relief from Stay Proceedings | 4.20 hrs. – | $ 504.00 |
| Travel Time (half rate) | 60.00 hrs. – | $ 3,600.00 |

Watts' fee application likewise provides project categories worked in this case at paragraph 6, setting forth the following project categories, hours, and amounts:

| | | |
|---|---|---|
| Asset Disposition | 1.10 hrs. – | $ 99.00 |
| Case Administration | 0.70 hrs. – | $ 63.00 |
| Claims Adm. And Objection | 18.90 hrs. – | $ 1,701.00 |
| Fee/Employment Applications | 2.50 hrs. – | $ 225.00 |
| Financing | 8.90 hrs. – | $ 801.00 |
| Analysis, Feasibility & Budgeting | 187.50 hrs. – | $16,874.98 |
| Relief from Stay Proceedings | 0.00 hrs. – | $ 0.00 |
| Travel Time (half rate) | 12.27 hrs. – | $ 552.15 |

## II. Fees for Pre–Conversion Services

"While it is not necessary to have a successful reorganization in order for debtor's counsel to be awarded fees, fees may be denied when counsel should have realized that reorganization was not feasible and therefore services in that effort did not benefit the estate." *In re Crown Oil, Inc.*, 18 Mont. B.R. at 283 *(quoting In re Kohl*, 95 F.3d at 714); *In re Coones Ranch, Inc.*, 7 F.3d 740, 744 (8th Cir.1993); *In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1324 (10th Cir.1993) (fees may be disallowed where counsel knew or should have known that reorganization was not a viable possibility). During the early months of this case, when Deschenes admitted Debtor's financial records were nonexistent, its operation "was in a shambles", the oil wells were in a state of disrepair, and the shareholders were fighting, Deschenes knew or should have known that reorganization was not a viable, or at least, was not a very likely possibility. Early in the case, Deschenes and Watts were unable to discover the Debtor's financial condition and the condition of its operations given shareholder discord and uncooperative officers; such recalcitrance raised obvious difficulties portending an unsuccessful reorganization.

Debtor's entire strategy throughout the Chapter 11 involved a gamble on whether oil prices would increase. The Plans prepared and submitted by Deschenes and Watts on behalf of the Debtor display Debtor's "tunnel vision" focus [7] on the price of oil while ignoring BLM and IRS problems, unexpired leases and royalties owners, and failing to set forth how creditors would be paid. Conversion Order, pp. 5, 7, 8. Even if the price of oil had increased as Debtor hoped, the Plans [8] failed to address these other problems or otherwise comply with the confirmation standards of 11 U.S.C. § 1129(a) and (b). *Id.*, p. 8. Watts' and Deschenes' services and expenses incurred in the course of Debtor's reorganization efforts, grounded solely upon an ethereal increase in oil prices while ignoring other confirmation require-

---

7. This tunnel vision persisted at the hearing on June 19, 2000. Both Watts and Deschenes continued to insist that creditors would have been paid under Debtor's Plan with the rise in the price of oil, continuing to ignore the failure of Debtor's Plans to address the requirements of § 1129.

8. "Hooking on to a liquidation plan ... was also a dismal mistake in judgment and proof by the Debtor." Conversion Order at p. 8.

ments, did not benefit the estate. *In re Crown Oil, Inc.*, 18 Mont. B.R. at 283; *In re Kohl*, 95 F.3d at 714. Both professionals knew or should have known early on in this case[9] that reorganization was not feasible. *Kohl*, 95 F.3d at 714; *In re Lederman Enterprises, Inc.*, 997 F.2d at 1323–24.

■ Deschenes contends that debtors' attorneys' fee requests should not be decided based upon a "contingency fee" basis, dependent upon ultimate confirmation of a plan. At hearing, counsel argued that such a rule would prevent a level playing field between debtor's and creditor's attorneys. The test for compensation under § 330(a) is not that of a "contingency fee". The test is whether the applicant's services are reasonably likely to benefit the estate. As the Ninth Circuit Bankruptcy Appellate Panel recently wrote: "[T]he applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered." *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co., (In re Mednet)*, 251 B.R. 103, 108 (9th Cir. BAP 2000). On the other hand, "an attorney fee application in bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not benefit the estate." *Kohl*, 95 F.3d at 714 (*quoting In re Reed*, 890 F.2d 104, 106 (8th Cir.1989)). "This rule is based upon the legislative history of the Bankruptcy Code section 330(a) and the unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors." *Kohl*, 95 F.3d at 714 (*quoting In re Hanson*, 172 B.R. 67, 74 (9th Cir. BAP 1994)); *see also In re Mahaffey*, 18 Mont. B.R. 285, 290 (Bankr.Mont.2000). The same unfairness occurs when a debtor's professionals seek to deplete the estate, as in the instant case, to the detriment of the estate and its creditors. None of the unsecured nonpriority creditors

would receive any distribution, and the Internal Revenue Service would at best receive only a portion of its priority claim.

■ Benefit to the estate is not restricted to only monetary benefit. *Kohl*, 95 F.3d at 715; *In re Holder*, 207 B.R. 574, 584 (Bankr.M.D.Tenn.1997). Another important consideration is whether the services rendered "promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of the bankruptcy cases and related adversary proceedings." *In re Holder*, 207 B.R. at 584 (*quoting In re Spanjer Bros., Inc.*, 203 B.R. 85, 90 (Bankr.N.D.Ill.1996)). The Court finds that Watts' and Deschenes' services do not satisfy the *Spanjer Bros.* test of promoting the bankruptcy process for orderly and prompt disposition of the bankruptcy case. Instead, their services promoted a lengthy delay, during which Debtor and its professionals hoped that oil prices would increase or that they would be able to negotiate a resolution with ResourceFund and Rimco. The evidence and testimony shows Deschenes and Watts consciously concealed the correct value of oil in its exhibits to the original Disclosure Statement and the Amended Disclosure Statement. The oil price of $16.00 per barrel was extremely optimistic given the information and expertise available to them; it was not consistent with the information available to them and no disclosures or qualifications were contained in the filed Disclosure Statements alerting the creditors or the court to the future dilemma associated with oil pricing and the possible effect it may have on funding. Debtor had the opportunity to amend the exhibits in its Amended Disclosure Statement and chose not to even with more accurate information available. This nondisclosure tactic appears through another example.

9. Deschenes and Watts both testified that they knew the Debtor's reorganization Plan was not feasible in early 1998, when even they

were forced to admit the price of oil was too low.

■ This next example of nondisclosure actually appears through an overt commission which will not be condoned by this Court and any officer of the court shall refrain from such conduct or suffer undesirable consequences. Such conduct fails the *Spanjer Bros.* test of promoting the bankruptcy process for orderly and prompt disposition of the bankruptcy case and fails the standard of veracity associated with the professional integrity demanded by the Court. Deschenes filed the Debtor's Plan and Disclosure Statement on January 20, 1998, together with a certificate of mailing which falsely certifies that the Plan and Disclosure Statement were mailed to the hundreds of creditors on or about January 15, 1998. The false certificate of mailing issued by Deschenes' office is simply unacceptable practice, wasted scarce judicial resources[10], and reinforces the Court's conclusion[11] that Deschenes' services did not benefit the estate or promote the bankruptcy process or orderly administration of the estate. *Holder,* 207 B.R. at 584; *Spanjer Bros.,* 203 B.R. at 90. Deschenes' explanation at hearing and in his response to the Court's Order to Show Cause filed May 26, 1999, that he knew the Plan was not confirmable and did not wish to incur postage costs by mailing an unconfirmable Plan, is no excuse for filing a false certificate of mailing with the Court. Such conduct undermines the integrity of the bankruptcy process. "The bankruptcy court has wide discretion over whether to allow fees, regardless of their excessiveness or reasonableness." *In re Columbia Plastics, Inc.,* 251 B.R. 580, 591 (Bankr. W.D.Wash.2000) (*citing In re Lewis,* 113 F.3d 1040, 1046 (9th Cir.1997)).

■ The fact that the Chapter 11 Plan was ultimately not confirmed does not, by itself, bar recovery of compensation for services performed in the Chapter 11 case. *In re American Metallurgical Products Co., Inc.,* 228 B.R. 146, 159 (Bankr. W.D.Pa.1998); *In re Jefsaba, Inc.,* 172 B.R. 786, 799 (Bankr.E.D.Pa.1994) ("[W]e do not conclude that only successful actions may be compensated under § 330. To the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable. Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful. Such services are also compensable so long as, at the outset, it was not clear that success was remote."). On the other hand, whether a reorganization is successful is a factor to be considered in determining whether a debtor's counsel's services provide a benefit to the estate. *In re MFlex Corp.,* 172 B.R. 854, 857 (Bankr.W.D.Tex.1994); *In re Lederman Enterprises, Inc.,* 143 B.R. 772, 775 (D.Colo.1992), *aff'd,* 997 F.2d 1321 (10th Cir.1993).

■ One bankruptcy court writes: "The Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate." *In re Hunt,* 124 B.R. 263, 267 (Bankr.S.D.Ohio 1990). "Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk." *In re MFlex Corp.,* 172 B.R. at 857 (*quoting In re Offield,* 128 B.R. 548, 550 (Bankr.W.D.Mo. 1991)); *In re Lederman Enterprises, Inc.,* 143 B.R. at 775.

---

**10.** The Clerk of the Bankruptcy Court mailed out an "Order and Notice for Hearing on Disclosure Statement" on January 20, 1998, to the long list of parties named on Deschenes' certificate of mailing. Deschenes' certificate of mailing was false as his office did not mail the Plan and Disclosure Statement to all of the parties named thereon.

**11.** The Court properly found that the DIP was using the Chapter 11 case as a delaying tactic in the Order to Show Cause entered May 21, 1998.

In the instant case, the Conversion Order makes it clear that the Debtor's reorganization under Chapter 11 was never feasible. Deschenes admitted at hearing that he showed up at the confirmation hearing fully aware that the Debtor's Plan could not be confirmed, but proceeded to "show up and take his lumps." Doing so lengthened the delay in this case and increased the costs to the Court and the creditors with no viable chance of a confirmable Plan.

Deschenes should have been aware early on in this case that reorganization was not feasible and that the services of counsel and other professionals in that direction would be of no benefit to the estate. *In re Hunt*, 124 B.R. at 267 ("Much time and effort went into the preparation of [plan and disclosure statement], but the underlying feasibility of the proposal was nonexistent at the time the plan was offered. An attorney should not expect to be fully compensated for such unrealistic effort"); *see also MFlex*, 172 B.R. at 857; *Lederman Enterprises, Inc.*, 143 B.R. at 775. The Debtor did not request relief from this Court's findings in the Conversion Order set forth above. Deschenes did not contest or request relief from those findings at the hearing, and they are, thus, final and binding. Instead, Deschenes appeared and admitted that he knew that the Debtor's Plans were not feasible[12], but asserts that he should be compensated for his services notwithstanding. Deschenes is seeking from the estate $46,104 in fees[13] and $7,549.28 in costs for a failed reorganization.

Bankruptcy Courts must examine the circumstances and the manner in which services are performed and the results achieved in order to arrive at a determination of a reasonable fee allowance. *In re Mednet*, 251 B.R. at 108. When it becomes obvious during a Chapter 11 that little or no hope of a reorganization exists and Debtor's counsel permits the Debtor to continue operations and to incur debts to the detriment of the estate and creditors, then the bankruptcy court has a duty to carefully and thoroughly scrutinize the services of the attorney and any professional. *See In re James Contracting Group, Inc.*, 120 B.R. 868, 873–74 (Bankr. N.D.Ohio 1990). Given the condition of Debtor's operations, finances, lack of records and shareholder discord discussed above, which the filed Plans never fully addressed, the professionals, specifically Deschenes, knew or should have known that Debtor's reorganization was highly unlikely to succeed. *Kohl*, 95 F.3d at 714; *In re Lederman Enterprises, Inc.*, 997 F.2d at 1323–24. "An attorney [or other professional] should not expect to be fully compensated for such unrealistic effort" as preparing a plan and disclosure statement in an unconfirmable reorganization case. *In re Hunt*, 124 B.R. at 267. As in *Hunt*, Deschenes and Watts seek compensation for their services in submitting Plans which failed to address the confirmation requirements of § 1129, and which never had a realistic chance of being approved. In incurring fees while attempting to reorganize the Debtor when it was clear no reorganization was feasible, counsel worsened the position of the creditors. *See, e.g., In re Vines, Inc.*, 159 B.R. 381, 382 n. 1 (Bankr.D.Mass.1993) ("Even while in Chapter 11, when it was relieved from the pressure of having to pay its prepetition debts, the Debtor lacked the wherewithal

---

**12.** Deschenes stated at the hearing on June 19, 2000, that the Plan of Liquidation "had holes we could drive a truck through."

**13.** Deschenes' fee application includes entries for 12/14/98 for drafting, finalizing and filing an amended Plan. These entries came more than three months after the Conversion Order was entered, yet request $106 for services related to the Chapter 11 Plan. Furthermore, the docket shows that contrary to these billing entries no Plan was filed on or about December 14, 1998. To his credit, Deschenes offered Ex. 14, a breakdown of hours by month, at the hearing on June 19, 2000, and stated that he took the time off for drafting the Plan and adjusted his bottom line. Ex. 14 sets forth a total for fees of $45,852.00.

to meet its ongoing operating expenses and to continue operating."). As this Court found in the Conversion Order, the Debtor, through Deschenes' and Watts' efforts, unduly shifted the financial risk to the creditors, and was "essentially speculating with the lender's interest in the assets." Conversion Order at 7–8. Having wasted the Court's time and scarce judicial resources by proceeding with a "merely visionary" Chapter 11 scheme while Debtor was "losing money at an alarming rate, on property that [was] admittedly in a dismal state of repair", with declining oil prices, (Conversion Order at pp. 4 & 8), the Court has the discretion to disallow all fees and costs Deschenes and Watts incurred while promoting Debtor's unconfirmable Plans. *Kohl,* 95 F.3d at 714; *In re Lederman Enterprises, Inc.,* 997 F.2d at 1323–24.

Attorneys and other professionals should not necessarily be blamed for the lack of management and the lack of success of a Chapter 11 debtor, but they should not be rewarded for stringing a bad case out for a lengthy period of time. *In re Central Florida Metal Fabrication, Inc.,* 207 B.R. 742, 751 (Bankr.N.D.Fla. 1997). Given the condition of Debtor's operations, records, and management, Deschenes and Watts should not be rewarded for stringing this case out for more than a year before it was converted. *Id.* As quoted in *Central Florida Metal Fabrication:* "W & G spent a great deal of time beating a dying horse. It urges that it did not know that the horse was near death when it invested further time and effort in the project. If attorneys are not guarantors of the results in bankruptcy cases, they may not remain ostrich like and ignore the reality of a case crumbling about them." 207 B.R. at 751 (*quoting In re York Village Associates,* 29 BCD 1283, 1287 (Bankr.D.Md.1996)). Deschenes' and Watts' tunnel-vision focus on a hoped-for increase in oil prices ignored the reality of

Debtor's condition, which was made more difficult by the Debtor's internal discord among the stockholders and the communication difficulties Deschenes had with the Debtor's president.

In light of the final findings set forth in the Conversion Order, this Court concludes that Deschenes and Watts each failed to demonstrate that the services they rendered throughout the case were reasonably likely to benefit the estate at the time the services were rendered, especially given the lack of oil price disclosure to the creditors and this court. *In re Mednet,* 251 B.R. 103, 107–08. Accordingly, the Court has the discretion to deny all of Watts' and Deschenes' fees in this unsuccessful reorganization case. *Kohl,* 95 F.3d at 714; *In re Coones Ranch, Inc.,* 7 F.3d at 744; *In re Lederman Enter., Inc.,* 997 F.2d at 1324. Denial of all fees and costs requested by Watts and Deschenes is justified in this case, and would be appropriate. Such justification is further supported in Deschenes' instance given the lack of veracity associated with the certificate of mailing.

On the other hand, the Court is mindful of the uncertainty faced by professionals in undertaking representation of a debtor in a difficult case, perhaps with a difficult client. In addition, the Court acknowledges that Deschenes negotiated a recovery for the estate shortly after the beginning of the case consisting of a ten percent interest in the oil wells from Resource-Fund, which Watts described as the single largest asset in the estate. Both Watts and Deschenes provided services in compiling and assembling the Debtor's Schedules and Statements. Deschenes represented the Debtor in the § 341 meetings of creditors in the Chapter 11 case, and after conversion in the Chapter 7 case. Watts provided the Chapter 7 Trustee with services, records, and information regarding possible preference actions against shareholders [14].

---

14. Watts described such preference actions as "de minimis" in his testimony on June 19, 2000.

Thus, for the purpose of alleviating hardship and for allowing reasonable fees likely to benefit the estate at the time the services and expenses were provided, the Court will award a portion of Watts' and Deschenes' requests for compensation even though it has the discretion to deny all their fees and costs requested in this case.

## A. Watts' Fee Application

■ After reviewing Watts' billing statements and Ex. 12, the Court will allow fees and expenses through January 27, 1998 in the respective amounts of $8,806.48 for fees and $208.80 for expenses, subject to the limitation and reduction of the total fee and expense award as set forth below. The Court will not allow the remaining balance for fees and costs as Watts' testified that when the per barrel oil price dropped below $15.23, the plan could not be confirmed. Such drop in the oil price occurred in December 1997, according to Ex. 11, p. 2. With the analysis performed by Watt during the initial months of this case, Watts knew through his additional analysis during January 1998, that Debtor's reorganization was highly unlikely, if not impossible, except with a substantial oil price increase. No disclosure of Watts' conclusion was contained in the Disclosure Statement or in the Amended Disclosure Statement. Throughout the disclosures made to the creditors or filed with the court, only a per barrel price of $16.00 was disclosed; no disclosure of risk or discussion associated with oil price fluctuation was included. Given this lack of candor by the Debtor's professional, Mr. Watt, and the additional facts set forth above, the Court reduces the allowed fees and expenses to a total of $7,500.00.

## B. Deschenes' Fee Application

■ After reviewing Deschenes' billing statements and Ex. 13 and 14, the Court will limit Deschenes' reasonable fees and expenses respectively to $10,000.00 for fees and $5,000.00 for expenses for the follow-ing reasons. In considering Deschenes' fees through January 27, 1998, fees amount to the sum of $27,456.00 and expenses amount to $6,790.18. Given the reduction in oil prices and Deschenes' testimony that oil prices were too low in January 1998 to make the plan feasible and the lack of disclosure associated with risk of oil price fluctuation, fees and costs incurred after January 27, 1998 are deemed unreasonable and will not be allowed.

The fees and expenses incurred prior to January 27, 1998 are hereby reduced given the lack of disclosure associated with the risk of oil price fluctuation, the dilatory tactics utilized once the oil prices dropped below $15.23, the use of a false certificate of mailing, the continued use of inaccurate information in the Amended Disclosure Statement, the failure to adequately address the BLM leases, the confirmation requirements of § 1129(a) and (b) and the additional facts discussed above. Consequently, the reasonable fees in the amount of $10,000.00 will be allowed and expenses in the amount of $5,000.00 will be allowed. Both are allowed as second-tier administrative expenses.

IT IS ORDERED the application for professional fees and costs filed by Gary S. Deschenes on April 21, 2000, is denied in part and granted in part; Deschenes is awarded $10,000.00 for fees and $5,000.00 for costs as second-tier administrative expenses of the estate, and is authorized to apply the funds disclosed in paragraph 5 of his application to this award, with the remainder of $14,300.57 to be turned over to the Chapter 7 Trustee, Joseph V. Womack.

IT IS FURTHER ORDERED the application for professional fees and costs filed by Tim J. Watts on April 21, 2000, is denied in part and granted in part; Watts is awarded a total of $7,500.00 for fees and costs as an administrative expenses of the estate and is authorized to apply the $1,894.50 retainer he received from estate funds against this award, with the remain-

der to be treated as a second-tier administrative expense payable by of the estate.

### ORDER

In this Chapter 7 bankruptcy, after due notice, hearing was held October 4, 2000, at Billings on Gary S. Deschenes' ("Deschenes")—attorney for the Debtor—and Tim J. Watts' ("Watts")—economist for the Debtor—"Motion for this Court's Reconsideration of its Order dated September 13, 2000." Deschenes and Watts appeared at the hearing both personally and through counsel Joel E. Guthals. Additionally, Neal G. Jensen, Assistant U.S. Trustee, appeared at the hearing in support of Deschenes' and Watts' request for reconsideration.

On April 21, 2000, Deschenes and Watts filed applications for fees requesting an award of fees and costs from the Chapter 7 bankruptcy estate in the sum of $53,653.28 and $20,624.13, respectively. A hearing on approval of the fee applications was held June 19, 2000. After a thorough review of the record and after careful consideration of the testimony and exhibits presented at the hearing, the Court entered an Order on September 13, 2000, awarding Deschenes $15,000.00 in fees and costs and awarding Watts $7,500.00 in fees and costs. The Court's fee award as set forth in the Order of September 13, 2000, prompted Deschenes' and Watts' instant request for reconsideration.

Prior to the October 4, 2000, hearing, the Court reviewed Deschenes' and Watts' request for reconsideration, the transcript from the hearing held June 19, 2000, the record in this proceeding and the Court's Order of September 13, 2000. Based upon a review of the foregoing, the Court, at the commencement of the October 4, 2000, hearing supplemented the Court's Order of September 13, 2000, by recognizing that Doug James—counsel for Dakota Western Bank, Craig D. Martinson—counsel for ResourceFund, L.P.I., and James A. Patten—counsel for Basic Earth Science Systems, Inc. appeared and testified in support of Deschenes and Watts fee applications. The Court's Order of September 13, 2000, only referred to the appearance made by the Chapter 7 Trustee, Joseph V. Womack.

Additionally, after further consideration of the record, the Court corrected its finding that Deschenes had filed a false certificate of mailing with this Court. In the Order entered September 13, 2000, the Court wrote:

> Deschenes testified that he knew in January 1998 that the plan of reorganization could not be confirmed with such low oil prices. In fact, the per barrel oil price fell below $15.23 in December 1997 and remained below that price for eighteen (18) months. Ex. 11, p. 2. As a consequence, Deschenes testified that he did not mail the Plan to all creditors; the high costs of copying and mailing associated with sending the Plan to so many creditors were not warranted when he knew it could not be confirmed. Deschenes' testimony directly contradicts his certificate of mailing which was filed together with the Plan and Disclosure Statement on January 20, 1998, in which Lisa Peck of Deschenes' office certifies "under penalty of perjury" that the Plan and Disclosure Statement were mailed by first class mail to all parties on January 15, 1998 [1].

The Court reached the above factual finding based upon the following testimony given by Deschenes at the June 19, 2000, hearing:

> That [January 1998] Plan we knew didn't work and we weren't about to come to this Court and try to put forth the feasibility on a plan that just was not going to work any longer. So we filed the amended plan. This Court in fact ordered that...did an Order to Show Cause why the case should not be dis-

---

**1.** Deschenes' billing statement verifies his testimony that the Plan and Disclosure Statement were not mailed to all creditors, notwithstanding the certificate of mailing.

missed because I had not distributed that January plan to the creditors. In this case your honor, there are over 500 creditors. Had I done that, just the mailing costs alone I think was something like $1,000.00.

The Court concluded, based upon Deschenes above testimony and the fact that Deschenes had only requested postage costs of $70.47 in January of 1998, that Deschenes had not served Debtor's January 14, 1998, Disclosure Statement and Plan of Reorganization on all parties-in-interest despite the "Certificate of Mailing Disclosure Statement for Plan of Reorganization and Plan of Reorganization dated January 14, 1998", which certified that all parties-in-interest had been properly served.

Deschenes clarifies in his request for reconsideration that the costs associated with mailing Debtor's January 1998 Disclosure Statement and Chapter 11 Plan are set forth in a Trustee's Report—a document not routinely filed with this Court, nor routinely considered by this Court. Moreover, Deschenes request for reconsideration states that while he did properly serve Debtor's Disclosure Statement and Chapter 11 plan in January of 1998, Deschenes did not reserve Debtor's amended Disclosure Statement or Chapter 11 Plan dated January 14, 1998, along with the notice of confirmation hearing and ballot by May 18, 1998, as earlier instructed by the Court. Deschenes' supplemental explanation comports with the record and thus, the Court will delete its previous finding as set forth above from the Order entered September 13, 2000.

After making the above adjustments to the Court's Order of September 13, 2000, the Court then allowed Deschenes and Watts to proceed with their request for reconsideration. As noted by the Court at the hearing held October 4, 2000, motions for reconsideration serve a limited purpose: to correct manifest errors of fact or law or to present newly discovered evidence. *In re Parcel*, 12 Mont. B.R.

535 (Bankr.Mont.1993); *In re Teigen*, 11 Mont. B.R. 91–92 (Bankr.Mont.1992) (quoting *In re Brazier Forest Products*, 122 B.R. 119, 121–22 (W.D.Wash.1989)). A motion for reconsideration cannot be used to raise arguments that could and should have been made before a decision or judgment was issued.

Because of the limited nature of motions for reconsideration, the Court allowed Deschenes and Watts an opportunity to make offers of proof in support of their request for reconsideration, but noted that the record was complete based upon the extensive testimony and exhibits presented at the prior hearing, in addition to the nine files which have been generated since the inception of this case in August of 1997. Deschenes and Watts, through their counsel, Mr. Guthals, made the following offers of proof:

1. Mr. Womack, the Chapter 7 Trustee would testify a manifest error of law and fact was made with respect to the Court's determination that the services performed by Mr. Deschenes and Mr. Watts did not benefit the Debtor or the bankruptcy estate.

  - Mr. Womack's testimony would show that the joint operating agreement with Rimco preserved the operation of the wells and improved the condition of the wells and resulted in the distribution of royalties to lessees and further, resulted in the realization of $92,500 when the Trustee sold that particular asset. If the joint operating agreement had not been negotiated and entered into through the efforts of Mr. Deschenes and Mr. Watts, the wells would have been "shut in" and worthless, producing nothing for the estate;

  - Because Rimco had operated the wells, there was a sum of $37,000 in accounts payable owed to the bankruptcy estate at the time this case was converted to Chapter 7;

- Seven wells in North Dakota were eventually sold to Titan Oil for the sum of $31,000. The availability of these wells was directly related to the efforts of Mr. Deschenes and Mr. Watts;

- The money generated by the sale of these assets and the recovery of accounts payable to the estate allowed the bankruptcy trustee to reach a settlement with the Bureau of Land Management regarding all of their claims and to take care of all the environmental claims as well; and

- Through the efforts of Mr. Deschenes and Mr. Watts, shareholder loans resulted in adversary proceedings for the recovery of preferences. The estate has recovered $35,000 from the shareholders so far and the Trustee has a judgment for $44,000 which has not yet been recovered but which is an asset of the bankruptcy estate.

In all, Mr. Womack's testimony would show that the value of this bankruptcy estate is $200,000, perhaps more, rather than the $125,000 as set forth in the Court's September 13, 2000, Order [2] and as a result, there are sufficient funds to pay increased fees to Deschenes and Watts and also to have money available to pay the tier two creditors.

2. Mr. Womack would also testify that because of Mr. Deschenes' and Mr. Watts' work, the bankruptcy estate was in an orderly condition to allow it to be wound up and liquidated avoiding years of litigation involving the BLM, EPA and conflicting ownership claims.

3. Mr. Deschenes and Mr. Watts believe the Court's Order of September 13, 2000, contains additional errors of fact and law that are

manifest and should, therefore, be corrected through the presentation of additional evidence:

- The standard announced by the Court in its Order, that the services must be reasonably likely to benefit the estate at the time the services were rendered was not correctly applied to the services performed by Mr. Deschenes and Mr. Watts and the Order overlooks many services they provided, including those provided after January;

- Mr. Deschenes and Mr. Watts did not make a mistake in continuing to work on the case when reorganization was not feasible. Instead, the evidence they would like to put on today will show that they did not learn that the reorganization could not be accomplished through restructure until May of 1998 as opposed to early 1998 as understood by the Court from the previous record;

- The Court erred in its determination that Mr. Deschenes and Mr. Watts were deficient in not disclosing the fluctuation in oil prices. Evidence will show they had numerous meetings with creditors at which oil prices were discussed over a period of several months. In addition, the liquidating plan of reorganization contains a disclosure of the fact that oil prices had dropped; and

- Mr. Deschenes and Mr. Watts believe the Court made an error with respect to their deficiencies in addressing the BLM claims and the tax situation with the IRS. Mr. Deschenes and Mr. Watts could offer testimony on this issue.

In addition, Deschenes and Watts proposed to introduce Exhibits B, K and L,

2. Mr. Womack, the Chapter 7 Trustee, testified at the hearing held June 19, 2000, that there was only $125,000 in the estate. Mr. Womack made his statement to the Court on June 19, 2000, without the benefit of first reviewing his file in this case and thus, the Court will adopt the $200,000 as now represented by Mr. Guthals.

which exhibits were not offered at the June 19, 2000, hearing and were only offered for the first time in conjunction with the request for reconsideration.

Neal Jensen, Assistant U.S. Trustee, also appeared and stated that even though Mr. Womack testified there was about $125,000 in the estate at the prior hearing, additional evidence would show that in addition to the $92,500 obtained from the sale of oil interests, $37,000 was collected in the form of proceeds from production, $31,000 was realized from the sale of seven wells in North Dakota, $35,000 was received from shareholder settlements, $44,000 is owed on a judgment against the shareholders and, finally, Mr. Deschenes has $30,000 in his trust account in the form of a partial retainer, showing $225,500 for the estate of which $29,500 has been paid by the Trustee to satisfy the BLM claims and to settle the EPA bond claims. In sum, Jensen argued there was a promotion of the bankruptcy process and administration through Deschenes' and Watts' efforts because (1) the BLM would have had to foreclose its liens in state court; (2) the wells would have been shut down; (3) the EPA bonds would not have been sufficient to cover potential liability (4) royalties would not have been collected and paid; and (5) the case would have required years of litigation to resolve who owned what.

The Court has carefully considered the offers of proof and appreciates the parties comments with regard thereto, but the offers of proof and comments involve matters that could have been raised by Deschenes and Watts at the hearing held June 19, 2000, and indeed many of the offers of proof are merely duplicative of evidence submitted to the Court at the June 19, 2000, hearing. Extensive testimony has been taken, numerous exhibits have been offered and several Orders have been entered in this case since August 1, 1997, when Debtor filed its voluntary petition.

In the instant request for reconsideration, Deschenes and Watts attempt to undo findings and conclusions made by this Court as far back as September 9, 1998, when this case was converted from Chapter 11 to Chapter 7.[3]

The Court set forth extensive findings of fact and conclusions of law in its Order entered September 13, 2000. The factual corrections concerning the veracity of Deschenes certificate of mailing made by the Court at the commencement of the hearing held October 4, 2000, do not change the outcome of that Order. In sum, Deschenes and Watts have failed to show that this Court committed a manifest error of fact or law in its prior Order. As noted above, motions for reconsideration serve a limited purpose and cannot be used to raise arguments that could and should have been made before a decision or judgment was issued.

IT IS THEREFORE ORDERED the Motion for this Court's Reconsideration of It's Order dated September 13, 2000, filed September 22, 2000, is granted in part and denied in part; the Court's Order of September 13, 2000, is amended to reflect that in addition to Joseph V. Womack, Doug James, Craig D. Martinson and James A. Patten appeared at the hearing held June 19, 2000, in support of Gray S. Deschenes' and Tim J. Watts' fee requests; the factual finding made by this Court in the Order entered September 13, 2000, that Debtor's Disclosure Statement and Chapter 11 plan or reorganization dated January 14, 2000, were not mailed to all parties-in-interest is hereby deleted from the Court's September 13, 2000, Order; and all other factual findings, conclusions of law and ruling shall stand as entered in the Court's Order entered September 13, 2000.

---

**3.** At that time, the Court found Debtor's evidence in support of confirmation "deplorably week and even non-existent." The Court further found that Debtor was "losing money at

an alarming rate, on property that [was] admittedly in a dismal state of repair", all arguably occurring while Debtor was under the counsel of Deschenes and Watts.