In re George BERG, d/b/a Berg Lumber Company, Debtor.

No. 00–41094–7.

United States Bankruptcy Court, D. Montana.

Sept. 25, 2001.

Neal G. Jensen, Asst. U.S. Trustee, Great Falls, MT.

## *MEMORANDUM OF DECISION*

RALPH B. KIRSCHER, Chief Judge.

Two applications for professional fees and costs filed on April 9, 2001, by Debtor's attorneys Greg A. Luinstra ("Luinstra") and Douglas C. Allen ("Allen"), are pending in this Chapter 7 bankruptcy case, which was converted from Chapter 11 by Order entered by the Court on January 18, 2001. The two applications seek compensation from the estate pursuant to 11 U.S.C. § 503 for services rendered while this case was in Chapter 11. Luinstra requests an award of $16,687.00 in fees

and $1,383.13 in costs. Allen requests an award of $15,147.00 in fees and $80.75 in costs. The U.S. Trustee's Office filed an objection on May 14, 2001, seeking denial of all fees and costs requested by Luinstra and Allen based upon the holding of *In re Crown Oil, Inc.*, 18 Mont. B.R. 505, 257 B.R. 531 (Bankr.D.Mont.2000), contending that Luinstra's and Allen's services provided no value or benefit to the estate and benefitted only the Debtor, who was found by this Court to be in violation of his fiduciary obligations while the case was in Chapter 11[1]. This Court sustains the objections of the U.S. Trustee for the reasons sets forth below, but awards Luinstra and Allen reduced fees and costs.

After due notice, a hearing on Luinstra's and Allen's fee applications and the U.S. Trustee's objection thereto was held at Great Falls on May 22, 2001. Luinstra, Allen and Assistant U.S. Trustee Neal G. Jensen ("Jensen") appeared. Jane Amdahl ("Amdahl"), attorney for the State of Montana Department of Environmental Quality ("DEQ"), testified. Other witnesses who appeared[2] and testified included: Curtis Larsen ("Larsen"), attorney for the Montana State Fund; Earl J. Crowder ("Crowder"); Richard S. Samson ("Samson"); and William Kebe ("Kebe"), the Chapter 7 Trustee. Exhibits ("Ex.") 1 and A through M were admitted into evidence, and the Court deemed Luinstra's and Allen's fee applications and billing records as part of the record. At the close of the hearing the Court offered the parties an opportunity to file briefs, which they declined, and took the matter under advisement.

This Court has exclusive jurisdiction over these matters pursuant to 28 U.S.C. § 1334(a). Luinstra's and Allen's fee ap-

---

1. Order converting case entered January 18, 2001, ("Conversion Order"), at pp. 7–8.

2. Samson appeared and testified by telephone call. No party objected to such appearance.

plications are core proceedings concerning administration of the estate under 28 U.S.C. §§ 157(b)(2)(A) and (B). This memorandum constitutes the Court's findings of fact and conclusions of law. F.R.B.P. 7052; 9014. After reviewing the fee applications, testimony in evidence and the record in this case, the matter of these fee applications is ready for decision. As both fee applications request awards of professional fees and costs from a Chapter 7 estate pursuant to 11 U.S.C. § 503 [3] after conversion of the case from Chapter 11, this Order addresses the similar issues involved with both fee applications.

At issue is whether Luinstra and Allen should be awarded professional fees and costs under 11 U.S.C. § 503 for their services rendered for the Debtor while this case was in Chapter 11, when the Debtor's proposed liquidation under Chapter 11 was unsuccessful and the case was converted to Chapter 7. This Court concludes that the U.S. Trustee's objections are well taken.

## BACKGROUND FACTS

Berg filed a Chapter 11 bankruptcy petition on April 27, 2000, and filed his Schedules and Statements on May 19, 2000. On Schedule A, Berg listed real properties with a total value of $1,960,200, including a former radar base/Bible College property, a lumber mill and related equipment, and forest properties. Schedule B lists personal property worth a total of $1,505,140.52, most of which consists of log and lumber inventory, sawmill equipment and accounts receivable related to the DIP's sawmill business. Schedule D listed secured claims totaling $1,140,726.89. Schedule E listed priority tax claims of

$19,000. Schedule F lists general unsecured claims totaling $2,278,938.75. At the time the case was converted to Chapter 7 on January 18, 2001, the claims register reflected filed Proofs of Claim asserting secured claims totaling $1,342,025.19; unsecured claims totaling $1,076,442.41; and priority claims totaling $278,388.86.

At the time the Debtor filed his Chapter 11 petition, his sawmill had between 45 and 50 employees and had been unprofitable for a number of years. Conversion Order, p. 3–4. Crowder testified, and Luinstra's response explains, that the Debtor filed his Chapter 11 petition to stop a sheriff's sale of the Debtor's logs, inventory, vehicles and machinery scheduled to take place in late April, 2000. The Chapter 11 bankruptcy petition stopped the sheriff's sale, but the Debtor's unprofitable operation of the sawmill continued and it closed in early July, 2000. Crowder wanted to purchase the sawmill, but had trouble arranging financing [4]. He made offers, but testified that the Debtor did not take his offers seriously until after the U.S. Trustee filed the motion to convert on December 7, 2000. Crowder testified that the reduction in sawmill inventory under Debtor's management totaled $226,000 while the case was in Chapter 11.

By the time the case was converted to Chapter 7 on January 18, 2001, the Debtor testified: the sawmill was shut down and he had no operating capital; a fire was burning in a sawdust pile on the premises; he had collected and spent much of the sawmill's accounts receivable; he had sold estate assets and deposited the proceeds in his personal checking account rather than a debtor-in-possession account and spent

---

**3.** Section 503(b)(2) provides for, after notice and a hearing, allowance of administrative expenses, including "(2) compensation and reimbursement awarded under section 330(a) of this title."

**4.** Crowder purchased the sawmill from the Chapter 7 Trustee after conversion.

such proceeds; he had given the People's Baptist Church of Lewistown, Inc. ("PBC") thousands of gallons of used oil without payment; and an oil spill occurred at the Bible College property which was occupied and used, without Court authority, by PBC. Conversion Order, pp. 4–5.

The Debtor did not file his required monthly operating reports in a timely fashion. The U.S. Trustee advised the Court that the first reports were filed August 30, 2001. Ex. B, D, E, F and M show consistent and substantial operating losses[5]. Kebe, the Chapter 7 Trustee, testified that the cumulative loss during the course of this Chapter 11 case was $345,000, which would not have been lost if the case had been in Chapter 7 from the outset. If the Debtor had closed the sawmill in June of 2000, Kebe testified, the losses would have been limited to $157,000.

Luinstra and Allen admit in their response that they and the Debtor recognized that the only possible plan which could have been formulated was a liquidating plan. However, the Debtor and counsel did not promptly propose a liquidating plan. Instead, the Debtor and counsel filed more than 3 months after the petition date on August 15, 2000, a motion to extend the exclusivity period for an additional period until November 15, 2001. The reasons given in Debtor's motion included the need to negotiate with creditors and prospective purchasers of estate properties, including a purchaser of the Maiden Valley property, presumably PBC.

After the Court granted Debtor's motion to extend the exclusivity period on August 16, 2001, the Debtor, on September 8, 2001, moved to sell the Bible College property to PBC without subjecting the property to competitive bidding. Objections were filed by the U.S. Trustee and several creditors, including the State Fund and the DEQ. After a hearing on Debtor's motion the Court entered its Order on September 21, 2000, denying Debtor's motion because of a lack of competitive bidding and because the Debtor failed to satisfy 11 U.S.C. § 363(b) and (f). The Court found that the Debtor failed to show: that secured creditors consented to the sale; that the proposed selling price was greater than the value of all liens on the property; or that such liens were subject to bona fide disputes. Order filed September 21, 2000, pp. 4–5.

The Maiden Valley Protective Association, LLC ("MVPA") had filed notices of its cash purchase offer attempting to bid on the Bible College property. Ex. I and J show that MVPA's attorney had sent the Debtor offers to purchase the Bible College property as early as September 20, 2000. Allen's fee application suggests at page 4 the following explanation on their strategy: "Counsel presented two offers of the [PBC] to purchase the Maiden Canyon property, anticipating each time that a higher competing offer would be received, which would enable the Court and counsel to fashion a procedure to finalize a sale to the highest bidder." Debtor's own testimony, however, refutes that aim. The Debtor testified at hearing on January 17, 2001, that he would refuse to sell the Bible College property to MVPA no matter how much it offered. His testimony is corroborated by Samson, who testified that the Debtor failed to respond to MVPA's offers and simply ignored them, prompting Samson to file MVPA's notices of its offers with the Court. Ultimately, the Court ordered the case converted to Chapter 7

---

5. Ex. M shows the following monthly net losses after draws: May 2000—$44,459; June—$112,287; July—$29,633; August—$23,727; September—$15,281. Ex. E shows a bottom line loss of $66,154. Ex. F shows a loss of $34,652 for November of 2000.

based upon the Debtor's refusal to consider's MVPA's offer, observing:

> In the instant case the record shows that DIP refuses to comply with his fiduciary obligation to maximize distribution to creditors and to preserve the property of the estate.

> On cross examination by Jensen the DIP stated flatly at hearing that no matter how much MVPA offers for the Bible College property he would refuse to sell to MVPA, because it "would not be right". Such intransigence is simply not in compliance with his fiduciary obligation to maximize distribution to creditors and to preserve the property of the estate. In this Court's view such refusal to comply with his fiduciary obligation to maximize the distribution to creditors, coupled with DIP's undisputed failure to insure the estate assets against loss, constitutes sufficient cause to convert this case to Chapter 7 without considering the other evidence supporting conversion. The Court finds that conversion is in the best interests of the estate compared with simple appointment of a trustee in Chapter 11, due mainly to the reduced administrative costs involved in a Chapter 7 compared with a Chapter 11. There is no prospect of rehabilitation, because the DIP's Plan is essentially a plan of liquidation. In any event, this DIP has forfeited any right to remain a debtor-in-possession by his unwillingness to comply with his fiduciary duties.

Conversion Order, pp. 7–8.

Of the creditors with whom Luinstra contends Debtor was negotiating, one such creditor identified in Debtor's motion to extend the exclusivity period is the State Fund, which Debtor's motion states had a disputed, contingent, unliquidated claim in the sum of $1,045,000. In fact, the State Fund filed Proof of Claim No. 64 on August 15, 2000, asserting an unsecured claim in the sum of $660,782.50. Larsen, who signed Proof of Claim No. 64 for the State Fund on August 3, 2000, testified that the State Fund had voluntarily reduced its claim to $660,782.50 prior to the filing of the Debtor's Chapter 11 petition as a result of its negotiations with Debtor's special counsel Tornabene and McKenna. Larsen testified that Tornabene and McKenna, not Luinstra and Allen, represented the Debtor in negotiations with State Fund.

As a result of a meeting of Larsen and Debtor's counsel on August 18, 2001, the State Fund agreed to accept $100,000 cash immediately upon confirmation of a Chapter 11 Plan and further payments of $125,000 under the Plan. That agreement terminated upon conversion of the case to Chapter 7. Luinstra and Allen both suggest that the Chapter 7 Trustee may be able to resurrect that settlement with the State Fund. However, no evidence supports that suggestion, and Larsen testified that it is "extremely doubtful" that the State Fund would reduce its allowed claim any further.

Another creditor of the Debtor is the DEQ, which had filed its amended Proof of Claim No. 61 on August 10, 2000, asserting potential administrative and priority claims for environmental contamination of Debtor's properties in Lewistown in the potential amounts of $345,000 and $650,000, respectively. DEQ's attorney Amdahl testified that she wrote to Luinstra on August 29, 2000, to discuss the DEQ's claim, but that Luinstra did not respond by the time of the hearing held on September 19, 2000. She testified that she asked Luinstra about her letter after that hearing, and Luinstra responded that he was too busy and would get back to her. When Luinstra and Amdahl finally met in November of 2000, she learned for the first

time that the Debtor denied that he owed any liability to the DEQ. Amdahl testified that the Chapter 7 Trustee has addressed the environmental problems, and made arrangements for remediation.

Allen's fee application requests fees and costs through January 24, 2001, in the total amount of $15,227.00, including 5.0 hours on January 24, 2001, after the case was converted to Chapter 7, for meetings with the Chapter 7 Trustee and the U.S. Trustee. Luinstra's fee application requests fees through December 1, 2000, and costs through December 29, 2000, in the total amount of $18,070.13.

## CONTENTIONS OF THE PARTIES

The U.S. Trustee objects to any award of fees and costs to both Luinstra and Allen, contending their services caused harm and were of no value or benefit to the estate. Jensen argues that this case was a liquidating case from the beginning and should have been filed under Chapter 7 to avoid the losses and harm to the estate. Jensen's reasons include: Debtor's unauthorized sale of assets and expenditure of proceeds and accounts receivable; Debtor's nonpayment of postpetition taxes and incurrence of other debts; Debtor's unauthorized use of estate property; and the oil spills occurring on the Bible College property. These reasons, Jensen argues, provide evidence that the Debtor, through representation by Luinstra and Allen, was promoting his own self interests rather than the estate's in spite of warnings by the Court and the U.S. Trustee. As the Court found the Debtor breached his fiduciary duties when it converted the case to Chapter 7, Jensen argues that it should deny any award to Debtor's attorneys for this failed Chapter 11 liquidation because

the attorneys, early in the case, should have recognized that no prospect of confirmation was possible, and because Luinstra's and Allen's services in furthering the Debtor's interests rather than the estate's resulted in losses for the estate.

Luinstra and Allen [6] respond that their efforts on behalf of the Debtor were reasonably calculated to produce and did produce significant benefits to the estate, and that Debtor's Chapter 11 Plan was confirmable except for the U.S. Trustee's "unilateral" filing of the motion to convert. They argue Debtor provided them very little time to evaluate the Debtor's circumstances prior to filing and to counsel Debtor about the benefits and burdens of a bankruptcy filing and whether a Chapter 11 case would be most beneficial for an orderly liquidation of properties. Some of the properties, in their opinion, were not easy to sell, such as the sawmill and the Bible College property. Luinstra contends that efforts by the Debtor's attorneys produced the liquidating roadmap and the prospective buyers for the Chapter 7 Trustee to sell the sawmill and Bible College property, and that without their efforts no buyers would have materialized. In addition, the attorneys argue their efforts involving the State Fund's claim created a benefit to the estate because the Trustee can resurrect that settlement. Luinstra and Allen contend that they relied on their client in preparing the Debtor's Schedules; and that as attorneys they cannot be made guarantors of the outcome or subject to a "contingency" fee which is dependent on confirmation. In their opinion if attorneys are held to the standard contained in their argument Chapter 11 bankruptcy relief will effectively no longer

---

6. Allen's response to the U.S. Trustee's objection, filed May 21, 2001, adopts and joins

Luinstra's response.

be available because of the risk of nonpayment to debtors' attorneys.

## DISCUSSION

Luinstra's and Allen's fee applications are filed under 11 U.S.C. § 503(b)(2), which correspondingly provides for allowance as administrative expenses compensation and reimbursement awarded under § 330(a).

### I. § 330(a)—Generally

[1] This Court has an independent obligation to review each application to evaluate the propriety of the compensation requested. *In re Busy Beaver Bldg. Centers, Inc.,* 19 F.3d 833, 841 (3rd Cir.1994); *In re Wildman,* 72 B.R. 700, 701 (Bankr. N.D.Ill.1987). *In re Crown Oil, Inc.,* 18 Mont. B.R. 505, 511, 257 B.R. 531, 537–38 (Bankr.Mont.2000).

In *Busy Beaver,* the court explained:

[T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte.* The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.... Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties.

*Busy Beaver,* 19 F.3d at 841 (*quoting In re Evans,* 153 B.R. 960, 968 (Bankr.E.D.Pa. 1993)).

Extensive case law has developed regarding the amount and type of information that applicants must include in their fee applications. The case of *In re WRB– West Associates,* 9 Mont. B.R. 17, 18–20 (Bankr.Mont.1990) summarizes:

Pursuant to 11 U.S.C. §§ 327–330 and Bankruptcy Rules 2016 and 2017, this Court has an independent judicial responsibility to evaluate fees requested from the estate. *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 831 (Bankr.Vt. 1987); *In re Seneca Oil Co.,* 65 B.R. 902 (Bankr.W.D.Okla.1986); *In re Frontier Airlines, Inc.,* 74 B.R. 973 (Bankr.Colo. 1987). The burden of proof to show entitlement to all fees requested from the estate is on the applicant. *In re Lindberg Products, Inc.,* 50 B.R. 220, 221 (Bankr.N.D.Ill.1985). This burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate. *In re Yankton College,* 101 B.R. 151, 158 (Bankr.S.D.1989); *In re Pettibone Corp.,* 74 B.R. 293, 305 (Bankr.N.D.Ill.1987). All expenses and fees must be shown as both actual and necessary under § [330(a)(3) ] of the Code. *S.T.N.,* 70 B.R. at 834; *Yankton College,* 101 B.R. at 158; *Seneca Oil,* 65 B.R. at 912. Moreover, *In re Convent Guardian Corp.,* 103 B.R. 937, 939–940 (Bankr. N.D.Ill.1989) holds:

Bankruptcy Rule 2016 provides that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (emphasis added) The Application should contain a detailed list of expenses including the date, the type and the amount. Expenses must be actual not estimates. *In re Wild-*

*man,* 72 B.R. 700, 731 (Bankr.N.D.Ill. 1987); *In re Marsh,* 14 B.R. 615, 617 (Bankr.E.D.Va.1981). An expense is necessary if it is incurred because it was reasonably needed to accomplish the proper representation of the client. *Wildman,* 72 B.R. at 731.

The above excerpt demonstrates that this Court is obligated to review each request for fees and costs to determine whether the applicant provides:

1. A description of the services provided, setting forth, at a minimum, the parties involved and the nature and purpose of each task;

2. The date each service was provided;

3. The amount of time spent performing each task; and

4. The amount of fees requested for performing each task.

Attached to both Luinstra's and Allen's fee applications are detailed billing statements setting forth the services each Applicant provided, the dates the services were provided, and the amount of time spent on the services. Other than Allen's lumping together of telephone conferences, the Court finds no significant lack of detail. The issue, therefore, is whether Luinstra's and Allen's services for the Debtor while the case was in Chapter 11 were reasonably likely to benefit the Debtor's estate, or necessary to the administration of the case.

## II. Fees for Pre–Conversion Services

"While it is not necessary to have a successful reorganization in order for debtor's counsel to be awarded fees, fees may be denied when counsel should have realized that reorganization was not feasible and therefore services in that effort did not benefit the estate." *In re Crown Oil, Inc.,* 18 Mont. B.R. at 283, 513, 257 B.R. at 539 *(quoting In re Kohl,* 95 F.3d 713, 714 (8th Cir.1996)); *In re Coones Ranch, Inc.,* 7 F.3d 740, 744 (8th Cir.1993); *In re Lederman Enter., Inc.,* 997 F.2d 1321, 1324 (fees may be disallowed where counsel knew or should have known that reorganization was not a viable possibility). Debtor filed the case *sub judice* to prevent a sheriff's sale of the sawmill equipment, vehicles and logs. Luinstra and Allen admit that the Debtor's only hope was a liquidation, and that a financial reorganization was not possible.

Luinstra spent time on April 26, 2000, reviewing the Debtor's payable ledgers and asset lists. Given the lack of liquidity of Debtor's assets and the nonprofitability of the sawmill for numerous years, any financial reorganization, other than liquidation, was never feasible. Debtor, given his familiarity and knowledge of his assets believed he would be in a better position than a bankruptcy trustee to market and liquidate his assets. Luinstra, accepting Debtor's belief that he should liquidate his assets, contends that the Debtor was in a better position under Chapter 11 to sell the sawmill and his other assets. Crowder, however, testified that the Debtor never took his offers seriously to purchase the sawmill assets until after the U.S. Trustee filed the motion to convert on December 7, 2000. As the above facts illustrate, the eight (8) months between the petition date and the U.S. Trustee's motion to convert allowed the Debtor, to the detriment of the creditors: to operate the sawmill without insurance; to incur post-petition taxes; to use, sell and attempt to sell estate assets without Court authority; and to spend the proceeds derived from assets. Kebe's testimony and Ex. B, D, E, F and M put the losses from operation of the sawmill at $345,000. In return for the services which resulted in such losses, Luinstra and Allen seek awards for attorney's fees and costs exceeding $33,000 as administrative expenses, to be paid ahead

of other creditors. The Court agrees with the U.S. Trustee that Luinstra and Allen knew or should have known that a financial reorganization of this case was not a viable possibility. The Debtor's history of losses, financial condition and refusal to conform to his fiduciary duties as a debtor-in-possession constituted red flags that should have prompted Luinstra and Allen to advise the Debtor to consider an immediate liquidation of assets through a liquidating plan or a Chapter 7 conversion.

Through Luinstra's and Allen's lack of professional control over their client, Debtor chose to proceed slowly under Chapter 11, a course that resulted in huge losses to the estate. Debtor's dilatory and piecemeal tactics allowed the Debtor to irresponsibly operate and control his assets to the detriment of the creditors. Debtor's entire strategy throughout his Chapter 11 liquidation consisted of searching for buyers for his unique and difficult-to-market properties, while negotiating with creditors for reduced payments on their claims. However, instead of rapidly formulating and negotiating a liquidating Plan, Debtor delayed the liquidation of assets, ignored his creditors, ignored Crowder's attempt to purchase the sawmill and MVPA's offers to purchase the Bible College property, and in August of 2000, moved for a 60 day extension of the exclusivity period even while incurring hundreds of thousands of dollars in mounting losses. He allowed PBC to make unauthorized use of the Bible College property and tried to sell PBC the Bible College property without Court authority and without exposing the property to competitive bidding. Luinstra and Allen were his attorneys and observed Debtor's conduct as debtor-in-possession, which in itself was a red flag[7].

Luinstra argues that the Debtor's Plan was confirmable except for the U.S. Trustee's motion to convert, and that other creditors did not file objections to Debtor's Plan. The record shows otherwise. DEQ filed a detailed objection to confirmation and to final approval of the Disclosure Statement. Other creditors filed objections to final approval of the Disclosure Statement. The U.S. Trustee and creditors Delta Southern Corporation/William Hoxie, and Deschenes, Watts, Wicks and Siebrasse filed objections to confirmation. The U.S. Trustee's motion to convert was joined by several creditors. In any event, the Court never reached the issue of confirmation, because it granted the U.S. Trustee's motion, converted the case to Chapter 7 and requested that a trustee to be appointed "with all deliberate speed in order to administer and protect the property of the estate." Conversion Order, p. 3. The Conversion Order and the findings and conclusions set forth therein were not appealed, and are final. Based upon those findings and the record, the Court finds that the services rendered by Luinstra's and Allen's were not reasonably likely to benefit the Debtor's estate or were not necessary for the administration of the case. *In re Crown Oil, Inc.*, 18 Mont. B.R. at 283; *In re Kohl*, 95 F.3d at 714. Professionally, they knew or should have known from the beginning of this case that Debtor would be difficult to control and would be hesitant to relinquish control of his assets. Given such knowledge, no evidence exists that as a consequence of his attorneys' efforts and representation did Debtor promptly negotiate and formulate a liquidating plan or seek a Chapter 7 conversion that would benefit the creditors.

---

7. Allen's fee application suggests that, with respect to the Debtor's repeated attempts to sell the Bible College property to PBC, he and Luinstra "anticipated" that the Court would step in and "fashion a procedure to finalize a sale to the highest bidder." Their client refused, and this refusal to comply with his fiduciary duty was a glowing red flag.

In fact the contrary is proven, Debtor during the initial eight (8) months of the case continued to irresponsibly operate his businesses and manage his assets without adequately appreciating the responsibilities imposed by the Bankruptcy Code on a debtor-in-possession. Prior to the lapse of eight (8) months, Luinstra and Allen knew or should have known that this Debtor was incapable or unwilling to formulate and execute a liquidating plan of reorganization. *Kohl*, 95 F.3d at 714; *In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323–24 (10th Cir.1993).

Luinstra argues that the U.S. Trustee is second guessing and engaging in hindsight, and that debtors' attorneys' should not be guarantors of outcomes whose fee requests are decided upon a "contingency fee" basis, that is dependent upon ultimate confirmation of a plan. Otherwise, he contends, Chapter 11 relief will no longer be available to debtors as attorneys will refuse to represent them because of the risk of nonpayment. In this Court's view, such danger is minimal, and furthermore Chapter 11 cases in circumstances like the instant case deserve discouragement.

■■■ The test for compensation under § 330(a) is not that of a "contingency fee". The test is whether the applicant's services were necessary and beneficial to the estate, not whether the debtor's activities, in hindsight, were necessary to achieve whichever outcome occurs. *In re Polishuk*, 258 B.R. 238, 248–49 (Bankr. N.D.Okla.2001). As the Ninth Circuit Bankruptcy Appellate Panel recently wrote: "[T]he applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered." *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Company, (In re Mednet)*, 251 B.R. 103, 108 (9th Cir. BAP 2000); *Crown Oil*, 18 Mont. B.R. at 515, 257 B.R. at 540. On

the other hand, "an attorney fee application in bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not benefit the estate." *Crown Oil*, 18 Mont. B.R. at 515, 257 B.R. at 540; *Kohl*, 95 F.3d at 714 (*quoting In re Reed*, 890 F.2d 104, 106 (8th Cir.1989)). "This rule is based upon the legislative history of the Bankruptcy Code section 330(a) and the unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors." *Id.*; *Kohl*, 95 F.3d at 714 (*quoting In re Hanson*, 172 B.R. 67, 74 (9th Cir. BAP 1994)); *see also In re Mahaffey*, 18 Mont. B.R. 285, 290 (Bankr. Mont.2000).

The same unfairness occurs when a debtor's professionals seek to deplete a bankruptcy estate, as in the instant case, by requesting more than $30,000 in administrative fees from the estate. The Court's decision to sustain the U.S. Trustee's objection to Luinstra's and Allen's fee applications should not result in the hardship they suggest. After conversion this case has generated monies for distribution which may produce a surplus. A promptly formulated and negotiated liquidating Chapter 11 plan may also have generated distributions to all creditors if the Debtor had been aggressive, but cooperative, and not recalcitrate. Allen's and Luinstra's services were designed and intended to benefit the Debtor rather than the estate, and they are free to seek compensation from the Debtor in the event of a surplus.

■■■ Benefit to the estate is not restricted to only monetary benefit. *Crown Oil*, 18 Mont. B.R. at 515, 257 B.R. at 540; *Kohl*, 95 F.3d at 715; *In re Holder*, 207 B.R. 574, 584 (Bankr.M.D.Tenn.1997). Another important consideration is whether the services rendered "promoted the bankruptcy process or administration of the estate in accordance with the practice

and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of the bankruptcy cases and related adversary proceedings." *Id.; In re Holder*, 207 B.R. at 584 (*quoting In re Spanjer Bros., Inc.*, 203 B.R. 85, 90 (Bankr.N.D.Ill.1996)). Because of the Debtor's delay and refusal to negotiate or to comply with his fiduciary obligations as a debtor-in-possession, the Court finds that Allen's and Luinstra's services fall far short of satisfying the *Spanjer Bros.* test of promoting the bankruptcy process for orderly and prompt disposition of the bankruptcy case.

■ The fact that the Chapter 11 Plan was ultimately not confirmed does not, by itself, bar recovery of compensation for services performed in the Chapter 11 case. *Crown Oil*, 18 Mont. B.R. at 517–18, 257 B.R. at 541–42; *In re American Metallurgical Products Co., Inc.*, 228 B.R. 146, 159 (Bankr.W.D.Pa.1998); *In re Jefsaba, Inc.*, 172 B.R. 786, 799 (Bankr.E.D.Pa.1994) ("[W]e do not conclude that only successful actions may be compensated under § 330. To the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable. Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful. Such services are also compensable so long as, at the outset, it was not clear that success was remote."). On the other hand, whether a reorganization is successful is a factor to be considered in determining whether a debtor's counsel's services provide a benefit to the estate. *Crown Oil*, 18 Mont. B.R. at 517–18, 257 B.R. at 541; *In re MFlex Corp.*, 172 B.R. 854, 857 (Bankr. W.D.Tex.1994); *In re Lederman Enterprises, Inc.*, 143 B.R. 772, 775 (D.Colo.

1992), *affirmed*, 997 F.2d 1321 (10th Cir. 1993).

■ As one bankruptcy court wrote: "The Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate." *Crown Oil*, 18 Mont. B.R. at 518, 257 B.R. at 541 *In re Hunt*, 124 B.R. 263, 267 (Bankr.S.D.Ohio 1990). "Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk." *Id.; In re MFlex Corp.*, 172 B.R. at 857 (*quoting In re Offield*, 128 B.R. 548, 550 (Bankr. W.D.Mo.1991)); *In re Lederman Enterprises, Inc.*, 143 B.R. at 775.

In the instant case, the Conversion Order makes it clear that the Debtor's liquidation under Chapter 11 became impossible because the Debtor was not fulfilling his fiduciary obligations or proposing to liquidate the estate in compliance with the Bankruptcy Code. Luinstra and Allen admit that a financial reorganization was not feasible, and they should have been aware early on in this case that unless the Debtor promptly and aggressively formulated and negotiated a liquidating plan that a delayed plan, subject to delays and the whims of their client, under Chapter 11 would not be confirmable and that the services of counsel in that direction would be of no benefit to the estate. *Crown Oil*, 18 Mont. B.R. at 518, 257 B.R. at 542; *In re Hunt*, 124 B.R. at 267 ("Much time and effort went into the preparation of [plan and disclosure statement], but the underlying feasibility of the proposal was nonexistent at the time the plan was offered. An attorney should not expect to be fully compensated for such unrealistic effort"); *see also MFlex*, 172 B.R. at 857; *Lederman Enterprises, Inc.*, 143 B.R. at 775. The Debtor did not request relief from this

Court's findings in the Conversion Order or Orders denying Debtor's motion to sell property as set forth above, and they are final.

■■■ While attorneys should not necessarily be blamed for the lack of management and the lack of success of a Chapter 11 debtor, they should not be rewarded for stringing a bad case out for a lengthy period of time. *Crown Oil,* 18 Mont. B.R. at 520, 257 B.R. at 543; *In re Central Florida Metal Fabrication, Inc.,* 207 B.R. 742, 751 (Bankr.N.D.Fla.1997). Given the condition of Debtor's operations, conduct, and mismanagement, Luinstra and Allen should not be rewarded for stringing this case out for more than 8 months before it was converted.

■■■ On the other hand, the Court is mindful of the uncertainty faced by professionals in undertaking representation of a debtor in a difficult case, perhaps with a difficult client such as is clearly shown in the instant case. *Crown Oil,* 18 Mont. B.R. at 521, 257 B.R. at 543. When undertaking representation of a debtor in bankruptcy, an attorney as a professional must inform the debtor of not only the benefits of bankruptcy, but also the burdens, including full and adequate disclosure of assets and financial information, reporting requirements, cooperation with any trustee, and any fiduciary obligations. An attorney will encounter difficult cases and difficult clients, but as a professional, an attorney must instruct the debtor on appropriate conduct and must develop client control. To foster such client control, an attorney must be: knowledgeable about the law; willing to communicate promptly with the client about all matters associated with the client's case; instructive on what alternatives and remedies are available to the client; knowledgeable about the parameters and limits of available alternatives and remedies, and unwilling to allow a client to direct or dictate the progress or activity in a case, if such activity is inconsistent with the requirements of the law. If an attorney believes a client is unwilling to listen and follow the advise of counsel, then the attorney must consider whether he/she is able to continue representing the client.

The Court acknowledges that Luinstra's and Allen's services in compiling and assembling the Debtor's Schedules and Statements may have ultimately aided the Chapter 7 Trustee. Thus, the Court will award a portion of Allen's and Luinstra's requests for compensation even though it has the discretion to deny all their fees and costs requested in this case. The Court notes that the Debtor was several months late in submitting his required operating reports, even though Luinstra's billing record shows he reviewed the operating guidelines as early as May 4, 2000. Ex. B, D, and M show that the Debtor incurred huge losses at the first reporting after May of 2000. The Court will allow Allen and Luinstra their fees and costs through May of 2000.

## A. Allen's Fee Application

After reviewing Allen's billing statement, the Court finds that through May of 2000, Allen provided legal services totaling $1,639.00, including working on preparation of Schedules and Statements and attendance at the § 341 meeting of creditors. During that period Allen incurred costs totaling $8.93. In addition, the Court will award Allen $550 for the meeting he attended with Kebe, Jensen and other parties after conversion on January 24, 2001, to acquaint the Trustee with the status of the case. Based upon the facts and reasoning set forth above, the U.S. Trustee's objection is sustained and the Court reduces Allen's allowed fees to $2,189.00 and allowed costs to $8.93.

## B. Luinstra' Fee Application

After reviewing Luinstra's billing statement, the Court will limit Luinstra's reasonable fees and expenses respectively to those incurred as of the end of May, 2000. The Court finds that during that period Luinstra lists entries for services totaling $3,916.00, including for preparation of Debtor's Schedules and Statements and attendance at the § 341 meeting of creditors, and costs totaling $104.33. Based upon the facts and reasoning set forth above, the U.S. Trustee's objection is sustained and the Court reduces Luinstra's allowed fees to $3,916.00 and allowed costs to $104.33.

IT IS ORDERED a separate Order shall be entered providing that the U.S. Trustee's objection, filed May 14, 2001, to the fee applications filed by Gregory A. Luinstra and Douglas C. Allen is sustained; the application for professional fees and costs filed by Greg A. Luinstra on April 9, 2001, will be denied in part and granted in part; Luinstra will be awarded a total of $3,916.00 in fees and $104.33 in costs as second-tier administrative expenses of the estate, and will be authorized to apply the estate funds disclosed in paragraph 6 of his fee application to this award, with the remainder to be turned over to the Chapter 7 Trustee William M. Kebe.

IT IS FURTHER ORDERED the application for professional fees and costs filed by Douglas C. Allen on April 9, 2001, will be denied in part and granted in part; Allen will be awarded a total of $2,189.00 in fees and $8.93 in costs as second-tier administrative expenses of the estate.